**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**MEGAN CRISANTE**
**and PMP CAFÉ, LLC,**

           **Plaintiffs,**

**v.**                                  **Case No. 8:11-cv-2007-T-17TBM**

**JIM COATS, individually and in his**
**Official Capacity as Sheriff of Pinellas**
**County, Florida, et al.,**

           **Defendants.**

_____/

## REPORT AND RECOMMENDATION

      THIS MATTER is before the court for a Report and Recommendation on **Plaintiffs'**

**Emergency Motion for Temporary Restraining Order, Motion for Preliminary**

**Injunction** (Doc. 2).[1] Defendant Jim Coats, former Sheriff of Pinellas County, Florida, filed

a response in opposition on behalf of the Defendants. (Doc. 9).[2] Oral arguments on the

motion were heard October 14, 2011.

I.

A.

      Certain facts pertinent to this motion appear undisputed. Plaintiff Megan Crisante

(Crisante) is an individual, purportedly residing in Florida, with management authority over

---

     [1]At the status conference on September 12, 2011, the court advised the parties that the
court would address the matter as a preliminary injunction.

     [2]In support of his response, the Sheriff filed the affidavit of Glenn L. Martin, Jr. (Doc.
20); the affidavit of Defendant Paul Giovannoni, Jr. (Doc. 21); and the state court search
warrant at issue (Doc. 21-1), including the affidavit of Desmond C. Ladner, a purported expert
in legal and illegal gaming activities.

Palm Harbor Internet (PHI).  Plaintiff PMP Café, LLC, is a Florida limited liability

corporation doing business as PHI at 38541 U.S. Hwy. 19 North in Palm Harbor, Florida.  PHI

is engaged in the business of selling prepaid long distance telephone cards (phone cards),

prepaid cellular phones, cellular accessories, internet access, and printing, faxing, and copying

services.  PHI operated a game promotion or "sweepstakes" in connection with its sale of the

phone cards and provided computers on its premises for customers' participation in its

sweepstakes and for accessing the internet.[3]

Defendants initiated an investigation of the activities at PHI for suspected illegal

gambling activity.  On July 14, 2011, Defendants executed a search warrant at PHI seizing

---

[3]The parties do not agree exactly how the sweepstakes works, but it can generally be described as follows: A PHI customer purchases a phone card from the cashier and is credited with the amount of phone time purchased as well as a proportionate number of free sweepstakes "entries."  The number of sweepstakes entries received is dependent upon the amount spent on the phone card.  Thus, the more pre-paid minutes purchased by the customer, the greater the number of sweepstakes entries received.  The customer may also obtain sweepstakes entries with no purchase either by mailing a request to the sweepstakes sponsor, Phone-Sweeps, or by making a request in person at PHI.  To determine whether the customer is a "winner," the customer may simply ask the cashier to reveal results by alphanumeric text at a point-of-sale computer or, alternatively, the customer may use the computer terminals located at PHI to select quick reveal or to play the casino-style video games to reveal the results of his/her entries.  Use of PHI's computer terminals to reveal sweepstakes results is free.  Some of the video games have a similar look and sound of casino-style games; one offers an electronic bingo-type game.  The customer chooses which game to play, identifies the number of sweepstakes entries he wishes to play, and then plays the game.  If any of the entries played are winners, such is depicted in a manner similar to the winning image in the casino game, for example, a certain number of similar images in a row.  Winnings are represented as points and are displayed and accumulated on the screen in a "win points" column which can be redeemed for cash prizes.  The customer may continue to play the video games as long as he/she has sweepstakes entries to play.  The games may be played only in connection with the sweepstakes and there is no opportunity for a customer to pay to play. The pre-paid telephone minutes purchased are never depleted by playing the video games and regardless of the sweepstakes results, the customer always walks away with the same number of minutes purchased.

Plaintiffs' point-of-sale computer, scores of personal computers at work stations and in boxes in storage, related computer equipment, cash, placards, a safe, a digital video recorder, and Tel-Connect phone cards among other items of property. Defendants Bahret and Giovannoni were affiants on the affidavit in support of the search warrant and participated in the search. By the deputies' sworn averments, many of which are disputed by Plaintiffs, Plaintiffs' business is:

> being operated under the disguise of a retail outlet that offers a sole
> product for sale and offers a 'sweepstakes' under 849.094 FSS (Game
> Promotion in connection with sale of consumer products or services)
> to promote gross sales. . . . [S]aid business is involved in selling a single
> phone card that offers local and long distance calling in conjunction
> with chances to win cash prizes. Unlike a traditional Promotional Sweep-
> stakes such as the widely known McDonald's Monopoly where a single
> pull-tab is provided on the purchased box of a Big Mac, said Palm Harbor
> Internet Services' 'sweepstakes' is offered electronically on a common
> Personal Computer (PC) and has the appearance of a Las Vegas style
> slot machine. . . . While the business model propagates promoting a
> viable product via sweepstakes, the business model runs afoul of 849.15
> by adapting innocent devices in such a way that they are converted into
> an illegal slot machine and overshadow the sales of the product.

(Doc. 21-1 at 6-7). By the deputies' further averments, the sale of phone cards was not at the forefront of the business but secondary to the gaming activity played in connection with the sweepstakes offered in connection with the phone cards. Thus, "the business of the consumer product offered[,] it is over whelmed by the advertisement within the business to play sweepstakes and win cash. The business model wants the consumer to sit, play, enjoy and believe that they can win cash on the devices." To that end, the interior of the business has a "Las Vegas casino mood" about it. And, to attract and entice customers to sit and repeatedly play, the Defendants' "'sweepstakes' is offered electronically . . . and has the appearance of a

3

Las Vegas style slot machine." The games have a "traditional appearance of a slot machine with virtual reels that contained various icons, payout lines, buttons and display windows." According to their gaming expert, the "readers are designed to show sights and sounds that replicate those found on acknowledged Las Vegas type slot machines to heighten the suspense and excitement of play." (Doc 21-1 at 7-8, 16).

The affiants set forth in some detail their investigation and understanding of how the system worked to operate as a slot machine in violation of Florida law. *See id.* at 8-11. They also referenced the opinion of Desmond Ladner, a purported expert on legal and illegal gaming matters, who also conducted an undercover investigation at the premises and offered his opinion that PHI operated as a gambling establishment and that its computers as networked constituted slot machines as defined under Florida law. *See id.* at 16-18. In sum, the affiants represented that when all the components of the system are considered collectively they are slot machines within the context of Fla. Stat. § 849.16 and are being used in violation of Fla. Stat. § 849.15.

The search warrant issued out of the Circuit Court in Pinellas County, Florida, on a finding that "the facts as alleged do exist and that the law is being violated as alleged and/or property which constitutes evidence relevant to proving that said crime has been committed is located [on the PHI premises] . . . ." (Doc. 21-1 at 1). The warrant authorized the seizure of:

> Slot machines to include all devices consisting of video monitor/tower combinations, keyboards, mouse and connecting cables, all network devices, all server devices, Point of Sale computer, all electronic storage devices connected internally or externally to any device, Point of Sale computer, Network device or Server, any documents showing evidence of maintaining the gambling house to include but not limited to utility

4

> records, bank records, Department of Revenue records, Winners Logs, Tel-Connect cards, . . . and any other gambling paraphernalia in order that the evidence may be procured to be used in the prosecution of such person or persons found to be involved in the illegal activity as alleged.

(Doc. 21-1 at 2). Additionally the warrant permitted for these items to be forensically examined. *Id*. at 3.

Suffice it to say that the Defendants' seizure of all the computers and related devices from PHI[4] has effectively shut down the sweepstakes activity on the premises. It has also shut down PHI's internet services as well. As of yet, no arrests have been made and no criminal charges have been brought. Nor have forfeiture actions been commenced against the seized property.

## B.

In response to seizure of their property, Plaintiffs filed their Verified Complaint asserting claims for violation of their Fourth, First, and Fourteenth Amendment rights (Counts I - III respectively) and seeking declaratory and injunctive relief (Counts I - IV). They further allege a claim for replevin by which they seek damages and a return of their property (Count V). *See* (Doc. 1). By Crisante's verified allegations, Plaintiffs operate their sweepstakes as a lawful game promotion in full compliance with Fla. Stat. § 849.094. As a consequence of Defendants' enforcement actions, their First, Fourth, and Fourteenth Amendment rights have been violated and an injunction is necessary to avoid further infringement of their constitutional rights, in particular, their First Amendment rights, should they seek to continue

---

[4]A copy of the search warrant return is found as an exhibit to the Complaint. *See* (Doc. 1 at 58).

their sweepstakes. Plaintiffs maintain that the video games used in connection with their phone card sweepstakes, as well as the internet communications services separately provided to customers, are communications protected by the First Amendment.[5] The taking of all the computers and related devices has completely curtailed the speech rights of their customers who seek to buy and use these internet services. (Doc. 1 at 8-12). In some detail, they assert that there is a clear pattern of harassment against phone-sweeps retailers such as PHI and that given that history, Defendants are acting knowingly and in bad faith to eliminate their ability to engage in business and thus protected speech-related activities. *Id*. at 14-20.[6] Additionally, Plaintiffs assert numerous instances wherein Defendants Giovannoni and Bahret made false or misleading factual assertions to the judge in the affidavit in support of the search warrant and, along with their expert, Ladner, asserted absurd legal conclusions in support of their claim that PHI was operating a gambling establishment using slot machines. They also maintain that the seizure by Defendants exceeded the permissible scope of the search warrant. *Id.* at 24-34.

---

[5]Other than a pornography filter, PHI did not limit, monitor, regulate, or restrict the use of its computers or the internet sites accessed by its customers in any way.

[6]In particular, Plaintiffs reference enforcement activities in Marion and Pinellas County. Thus, they contend there is a pattern of harassment as evidenced by some nineteen criminal prosecutions against phone-sweeps retailers in the past two years. By Plaintiffs' accounting, none of these prosecutions resulted in a conviction. Rather, the cases were either dismissed or the sweepstakes' operators prevailed at jury trial. In addition to criminal prosecutions, there have been multiple civil forfeiture actions, including five civil forfeiture actions by the Sheriffs in Marion and Pinellas County. Of these, all were voluntarily dismissed and in four the property returned. With this track record, Defendants may not claim any good faith but mistaken belief that their actions in shutting this business down were in good faith and lawful. *Id.*

Plaintiffs maintain that the enforcement activities directed toward their use of depictions of casino-style gaming to reveal the results of their sweepstakes amounts to prohibited content-based restrictions on their rights to speech. By their assertions, while the Defendants have deemed the method of displaying sweepstakes results to be illegal, there is no difference between the "traditional Promotional Sweepstakes" referenced by affiants and Plaintiffs' sweepstakes other than the manner and content of the communication of the results.[7] (Doc. 1 at 34-40). As a consequence of these enforcement activities, their property has been wrongfully taken and withheld, *see id.* at 53-54; their Fourth Amendment rights to be free from unreasonable searches have been violated, *see id.* at 40-42; their rights to free speech have likewise been denied and are being denied, *see id.* at 42-47; and their Fourteenth Amendment rights to equal protection have been denied, *see id.* at 47-51.

II.

A.

Rule 65 of the Federal Rules of Civil Procedure governs the entry of a preliminary injunction. The purpose of a preliminary injunction is to maintain the *status quo* until the

---

[7]By their motion, Plaintiffs contend that Florida law does not proscribe their sweepstakes. Thus, Plaintiffs argue gambling has three elements: (1) consideration paid; (2) for a chance; (3) to win a prize. Their sweepstakes is not gambling because the participants never pay consideration for the chance to win. Instead, the consideration paid by the customer is for the phone card, and the chances to win are provided at no additional cost as part of the game promotion. The customer never risks the loss of any money paid. Since the element of consideration is missing, their sweepstakes, like the so-called "traditional" sweepstakes, is a legal game promotion in contemplation of Fla. Stat. § 849.094. As for Defendants' claim that the computer-based system Plaintiffs use to reveal sweepstakes winners is an illegal slot machine as defined in Fla. Stat. § 849.16, Plaintiffs urge that Defendants simply cannot bring their devices within the statutory definition. *See* (Doc. 2 at 14-15).

court can enter a final decision on the merits of the case.  *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011).  A party seeking entry of a preliminary injunction must establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.  *Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011).

"A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites."  *Id.* (quoting *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009)).  The entry of a preliminary injunction is "the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion."  *Siegel v. LePore*, 234 F.3d 1163, 1179 (11th Cir. 2000) (citations omitted).  A plaintiff may support its motion for a preliminary injunction by setting forth allegations of specific facts in affidavits.  M.D. Fla. R. 4.06(b)(2), 4.06(b)(3).  In considering a motion for preliminary injunctive relief, a district court may rely on affidavits and hearsay materials that would not be admissible as evidence for entry of a permanent injunction.  *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

B.

Section 849.08, Fla. Stat., which is entitled "Gambling," states: "[w]hoever plays or engages in any game at cards, keno, roulette, faro or other game of chance, at any place, by

any device whatever, for money or other thing of value, shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083."

Under Florida law, sweepstakes or "'game promotion' means . . . a contest, game of chance, or gift enterprise, conducted within or throughout the state and other states in connection with the sale of consumer products or services, and in which the elements of chance and prize are present."  Fla. Stat. § 849.094(1)(a).

"Any machine or device is a slot machine or device within the provisions of this chapter if it is one that is adapted for use in such a way that, as a result of the insertion of any piece of money, coin, or other object, such machine or device is caused to operate or may be operated and if the user, by reason of any element of chance or of any other outcome of such operation unpredictably by him or her, may: (a) [r]eceive or become entitled to receive any piece of money, credit, allowance, or thing of value, or any check, slug, token, or memorandum, whether of value or otherwise, which may be exchanged for any money, credit, allowance, or thing of value . . . ; or (b) [s]ecure additional chances or rights to use such machine, apparatus, or device, even though it may, in addition to any element of chance or unpredictable outcome of such operation, also sell, deliver, or present some merchandise, . . . or other thing of value."  Fla. Stat. § 849.16(1).

Florida law prohibits the use of slot machines or devices, "pursuant to which the user thereof, as a result of any element of chance or other outcome unpredictable to him or her, may become entitled to receive any money, credit, allowance, or thing of value or additional chance or right to use such machine or device, or to receive any check, slug, token or

memorandum entitling the holder to receive any money, credit, allowance or thing of value." Fla. Stat. § 849.15(1)(b).

### III.

### A.

Plaintiffs seek a preliminary injunction enjoining Defendants "from taking any further enforcement action against Plaintiffs for their lawful, speech-related activities" at PHI. (Doc. 2 at 20). As movants, Plaintiffs bear the burden of persuasion as to all four elements in order to establish an entitlement to injunctive relief. *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 265 F.3d 1193, 1200 (11th Cir. 2001) (citing *Siegel*, 234 F.3d at 1176). Since the purpose of a preliminary injunction is to prevent future wrongs, *see U.S. v. Bob Lawrence Realty, Inc.*, 474 F.2d 115, 126 (5th Cir. 1973) (citing *Swift & Co. v. United States*, 276 U.S. 311, 326 (1928)), Plaintiffs must initially demonstrate an ongoing harm.

Here, Plaintiffs claim ongoing infringement of their First Amendment rights as a consequence of Defendants' improper enforcement and taking of all of their computers and related devices and the threat of continued enforcement action should they reestablish their sweepstakes. They urge the enforcement is directed against the content of their video games used in conjunction with the sweepstakes. Thus, their rights to free expression are affected in several ways. First, the internet access previously provided to employees and customers– but now denied– is a form of pure speech zealously protected by the First Amendment.[8] Further, video games are a recognized form of expression, even if such videos depict casino-type

---

[8]Plaintiffs cite *Reno v. ACLU*, 521 U.S. 844, 851 (1997).

games, and thus deserve First Amendment protection.[9]  And, even if their sweepstakes is viewed as a form of advertising or marketing and thus commercial speech offering customers the possibility of a prize, it is entitled to significant First Amendment protection.[10]  Plaintiffs purportedly do not challenge Florida's gambling laws as unconstitutional but instead contend that Defendants seek to enforce laws that are "not on the books" to suppress speech fully protected by the First Amendment.  In short, Plaintiffs contend that they are substantially likely to prevail on their constitutional claim as their depiction of gambling-type activity to reveal sweepstakes winners does not violate Florida law and the enforcement action is simply a content-based restriction on their free speech rights.  Given the history of phone sweeps prosecutions in Florida, the Defendants are clearly acting in bad faith and without a reasonable likelihood of obtaining a valid conviction.

On the matter of irreparable injury, Plaintiffs urge that even a minimal loss of First Amendment freedoms constitutes irreparable injury.[11]  Here, the infringement continues unabated.

In balancing the harms an injunction might cause, Plaintiffs urge that as a matter of law, their harm is irreparable, Defendants have no legitimate interest in their enforcement

---

[9]Plaintiffs cite *Brown v. Entertainment Merchants Ass'n*, ___ U.S. ___, 131 S. Ct. 2729, 2733 (2011).

[10]Plaintiffs cite *Sorrell v. IMS Health Inc.*, ___ U.S.___, 131 S. Ct. 2653 (2011) and *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976).

[11]Plaintiffs cite *Elrod v. Burns,* 427 U.S. 347, 373 (1976) and *Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981).

action, and Defendants will not be harmed if precluded from pursuing baseless civil or criminal litigation against Plaintiffs.[12]  Finally, they urge that a preliminary injunction precluding enforcement of an unconstitutional law, serves the public interest which favors protecting First Amendment expression.[13]

In response, Defendants maintain that Plaintiffs use an illegal device, that is, a slot machine, to reveal sweepstakes results in contravention of Fla. Stat. §§ 849.15 and 849.16 and that here, the property seized was taken on the authority of a duly authorized search warrant and as part of an ongoing investigation of the allegedly illegal activity on the premises which should not be enjoined.  Defendants note that Plaintiffs do not challenge any particular provision of Florida's anti-gambling statutes as unconstitutional but instead maintain that their operations are fully compliant with the game promotion provision of those laws and thus not properly the subject of this enforcement action.  Defendants urge, to the contrary, that Plaintiffs do not operate their sweepstakes lawfully and thus can have no valid constitutional objection to the suppression of unlawful commercial activity.[14]  As Defendants view the matter, the gravamen of the dispute is simply whether or not the seized devices are slot

_____

[12]*KH Outdoor, LLC v. City of Trussville,* 458 F.3d 1261, 1272 (11th Cir. 2006).

[13]*KH Outdoor, LLC,* 458 F.3d at 1272; *Northshor Experience, Inc. v. City of Duluth, Minn.*, 442 F. Supp. 2d 713, 719 (D. Minn. 2006); *Deja Vu of Nashville, Inc. v. Nashville,* 274 F.3d 377, 400 (6th Cir. 2002); *Michel-Trapaga v. City of Gainesville,* 907 F. Supp. 1508, 1513 (N.D. Fla. 1995).

[14]Defendants cite *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 563-64 (1980).

machines under Florida law.  By their investigation to date,[15] the computers and related

devices when operating together, constitute a slot machine and Plaintiffs may not, consistent

with Florida law, use such an illegal device to reveal its sweepstakes' winners.  In essence,

they urge that such a factual dispute is not appropriate for resolution on a motion for

temporary injunction and Defendants should not be enjoined from their investigation.  As for

Plaintiffs' claims of bad faith, Defendants deny any bad-faith harassment in this single

investigation.[16]  (Doc. 9 at 6).

On the matter of irreparable harm, Defendants urge again that the protections granted

by the First Amendment are not implicated where the Plaintiffs use illegal slot machines in

connection with their commercial activity.  And, contrary to Plaintiffs' urging, this is a case

where any criminal prosecution which may follow the investigation will supply an adequate

remedy and adequately vindicate Plaintiffs' constitutional rights.[17]  Here, the video games and

computers are employed by Plaintiffs as a marketing tool, and are unnecessary for Plaintiffs'

customers to discover whether they have won or to collect the prize.  Thus, the seizure of a

marketing tool that is irrelevant to the sweepstakes results does not amount to irreparable

harm.  (Doc. 9 at 8).

---

[15]The search warrant authorized both the seizure and a forensic examination of the equipment.  At the time of the hearing, the forensic examination had not been conducted.

[16]Defendants note that the only other phone sweeps matter involving this Sheriff was the prosecution and forfeiture action involving Mike's Internet.  In that action, the forfeiture complaint was ultimately dismissed, but one employee of Mike's was prosecuted and admitted guilt as part of a pretrial diversion program.  They urge that there was no allegation of bad faith in that prosecution.

[17]Defendants cite *Dombrowski v. Pfister*, 380 U.S. 479 (1965).

As for the remaining factors for consideration on this motion, Defendants urge that the public's interest in having the Sheriff investigate criminal activity is substantial and outweighs any harm to Plaintiffs in not being able to use this sweepstakes format employing slot machines to reveal sweepstakes results. The public interest is better served by permitting the investigation to continue "and for the public to find alternatives access to the internet, fax services and video games during the investigation into the 'gaming devices' seized pursuant to a search warrant." (Doc. 9 at 9).

B.

At the outset, it is appropriate to address the proposed intervention by a federal court into ongoing criminal proceedings in a state court. In general, such intervention in state court criminal prosecutions is inappropriate absent special circumstances evidencing bad faith and harassment by state authorities causing irreparable injury which cannot adequately be addressed in the state court proceeding. Thus, the general rule remains that:

> interference with the processes of the criminal law in state courts, in whose control they are lodged by the Constitution, and the determination of questions of criminal liability under state law by federal courts of equity can be justified only in most exceptional circumstances, and upon clear showing that an injunction is necessary in order to prevent irreparable injury. . . . And in the exercise of the sound discretion, which guides the determination of courts of equity, scrupulous regard must be had for the rightful independence of state governments and a remedy infringing that independence which might otherwise be given should be withheld if sought on slight and inconsequential grounds.

*Beal v. Mo. Pac. R.R. Corp.*, 312 U.S. 45, 49 (1941) (internal citations and quotations omitted). In the absence of special circumstances to "warrant cutting short the normal adjudication of constitutional defenses in the course of a criminal prosecution," federal

14

intervention is unwarranted.  *Dombrowski*, 380 U.S. at 485.  This is so because "[i]n such cases it does not appear that the plaintiffs 'have been threatened with any injury other than that incidental to every criminal proceeding brought lawfully and in good faith, or that a federal court of equity by withdrawing the determination of guilt from the state courts could rightly afford petitioners any protection which they could not secure by prompt trial and appeal pursued to this Court.'"  *Id.* (quoting *Douglas v. City of Jeannette*, 319 U.S. 157, 164 (1943)).

However, because of the sensitive nature of constitutionally protected expression, the Supreme Court has not required that "all of those subject to overbroad regulations risk prosecution to test their rights.  For free expression - of transcendent value to all society, and not merely to those exercising their rights - might be the loser."  *Dombrowski,* 380 U.S. at 486.  And in cases such as *Dombrowski* where state officials invoke state laws "in bad faith to impose continuing harassment in order to discourage [citizens' expressive] activities," the general rule is set aside and a federal court may act to curtail the infringement of rights.  *Id.* at 490.  Thus, after *Dombrowski*, federal court intervention in a state court criminal proceeding may be appropriate upon a showing of special circumstances[18] beyond the injury[19] incidental

---

[18]In *Dombrowski*, the special circumstances were found in the allegations of bad faith threats by State officials to enforce overbroad statutes which sought to regulate speech.  Thus, the threats were "not made with any expectation of securing valid convictions, but rather are part of a plan to employ arrests, seizures, and threats of prosecution under color of the statutes to harass appellants and discourage them and their supporters from asserting and attempting to vindicate the constitutional rights of Negro citizens of Louisiana."  *Id.* at 482.

[19]The requisite injury was found in the allegations, which if true, depicted a situation in which defense of the State's criminal prosecution would not assure adequate vindication of plaintiffs' constitutional rights and instead suggested that a substantial loss of or impairment

to every proceeding brought lawfully and in good faith. *Cameron v. Johnson*, 390 U.S. 611, 618 (1968). As *Cameron* illustrates however, not every infringement of expression is sufficient. There, the Court affirmed the denial of injunctive relief on findings that there was no showing of bad faith, harassment, intimidation or oppression in the state's enforcement of a facially valid statute that prohibited interference with the orderly use of courthouse facilities by all citizens alike. "Any chilling effect on the picketing as a form of protest and expression that flows from good-faith enforcement of this valid statute would not, of course, constitute that enforcement an impermissible invasion of protected freedoms." *Id*. at 619.

But what of cases in which there is no challenge to an underlying statute or regulation and there is no prosecution actually pending? In particular circumstances, courts have held that injunctive relief is available where the state statute being enforced by the police is, itself, valid, "as it is just as easy to discourage the exercise of First Amendment rights by abusing a valid statute as by using an invalid one." *P.A.B., Inc. v. Stack*, 440 F. Supp. 937, 944 (S.D. Fla. 1977) (citing *Krahm v. Graham*, 461 F.2d 703, 707 (9th Cir. 1972); *Jones v. Wade*, 479 F.2d 1176, 1182 (5th Cir. 1973)). Thus, in *Stack*, the court found injunctive relief appropriate to stop harassing and bad faith enforcement activities undertaken by county and city law enforcement for the purpose of inhibiting the exercise of First Amendment rights at adult bookstores. *P.A.B., Inc.*, 440 F. Supp. at 944. Considerations of equity, federalism and comity do not "prohibit a federal court from exercising jurisdiction to afford injunctive relief

_____

of freedoms of expression would occur if plaintiffs had to wait for the state court's disposition. The demonstration of such irreparable injury permitted federal court intervention. *Dombrowski*, 380 U.S. at 485-86.

where extraordinary circumstances such as a continuous, clear and pervasive pattern of harassment is established by the evidence and likely to continue; particularly, when such relief can be afforded without requiring the granting of injunctive relief restraining state criminal proceedings and/or undue interference with either judicial and/or administrative duties and functions of state officials." *Id.* at 945.

*Jones* is also instructive. There, the court stated that when a state is seeking to enforce its criminal statute "in good faith and without discrimination, the case for federal anticipatory relief is normally less strong when a statute is challenged as applied than when it is attacked as unconstitutional on its face." *Jones*, 479 F.2d at 1182. This is so because "[a]ssuming it is enforced in good faith, a facially valid statute, unlike an overbroad statute, poses no danger of a broad societal chilling effect on federal rights" *Id*. Nonetheless, considerations of federalism are viewed in a different light when state proceedings are merely threatened and not yet pending. Thus, "[a] federal injunction at the pre-prosecution stage causes only a minimal disruption of the state's enforcement of its criminal laws, since state prosecutorial machinery has not yet been set in motion." *Id*. at 1181.

C.

While not conceding as much, Plaintiffs' challenge is essentially an as-applied challenge to the otherwise facially valid provisions of Florida's anti-gambling laws that prohibit the use of slot machines. Defendants claim Plaintiffs' computers and video games, when networked with other devices, constitute slot machines within the purview of Fla. Stat. §§ 849.15 and 849.16, and Plaintiffs may claim no First Amendment protections for their

illegal activity. By Plaintiffs' argument, their devices cannot be brought within the statutory definition of "slot machine," and when the gambling statute is properly construed, it offers no bar to their game promotion despite the casino-style games customers may play to reveal their sweepstakes results. Given that their activity is lawful and such video games as are used to reveal sweepstakes results are protected speech, Plaintiffs urge that the purpose of the Defendants' enforcement activity is clearly directed toward and intended to suppress protected speech.

Suffice it to say that neither the Florida legislature nor its courts have provided a clear answer as to whether the video game activity employed here in connection with a sweepstakes involves the use of slot machines or is otherwise prohibited gambling.[20] While Plaintiffs seek that determination on this motion, I think it unnecessary and improvident for this court to resolve that dispute on this limited record.[21] Here, the enforcement action at issue was taken on the authority of a court-authorized search warrant and directed at computers and devices the

_____

[20]An Attorney General opinion related to telephone card sweepstakes games states that such "[g]ambling activities may not be disguised as a 'game promotion' under the terms of section 849.094, Florida Statutes, in an effort to avoid the criminal sanctions attendant to violations of Florida's gambling laws." Op. Att'y Gen Fla. 2207-48, 2007 WL 3357167, at *4 (Fla. A.G. Nov. 8, 2007). However, as demonstrated in the Complaint, the issues involved in these phone card sweepstakes have not been so easily resolved in state court proceedings.

[21]I conclude that it is not possible on this record to determine whether or not the Plaintiffs' computers and devices constitute slot machines. A strict reading of the Florida statute defining slot machines certainly leaves room for doubt about this and, as the pleadings reveal, the Sheriff himself has evidenced some doubt as to this as well. The forensic examination could shed light on the dispute, but, inexplicably, such has not been completed. The sworn affidavit of Defendants' purported expert is countered by the sworn allegations of the Complaint as to how these devices work. In any event, as discussed below, I conclude that principles of federalism and comity dictate the matter be addressed first by the state court.

state court judge found probable cause to believe operated as slot machines. On this record, it is enough for this court to conclude that at least insofar as Defendants are investigating in good faith perceived violations of an otherwise facially valid statute prohibiting slot machines, the federal court should refrain from issuing the broad injunctive relief sought by Plaintiffs to preclude any further enforcement of these laws against them. *See Cameron*, 390 U.S. at 618 (citing *Dombroski*, 380 U.S. at 484-85) ("Federal interference with a State's good-faith administration of its criminal laws 'is peculiarly inconsistent with our federal framework' and a showing of 'special circumstances' beyond the injury incidental to every proceeding brought lawfully and in good faith is requisite to a finding of irreparable injury sufficient to justify the extraordinary remedy of an injunction."). At present, there is no adequate showing of such special circumstances or bad faith on the part of these Defendants to justify federal court intervention that would, in effect, prohibit Defendants from enforcing against Plaintiffs otherwise valid anti-gambling provisions of Florida law.[22] Thus, insofar as Plaintiffs complain that such enforcement precludes their using video games to reveal their sweepstakes winners, any infringement of Plaintiffs' speech rights in this regard is merely incidental to the criminal investigation and goes no further as Plaintiffs are free to use another method to reveal such

---

[22]Bad faith in this context "generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction." *Kugler v. Helfant*, 421 U.S. 117, 126 n.6 (1975). Here, Plaintiffs rely chiefly on events occurring in and enforcement activities undertaken by law enforcement officials in Marion County, Florida. I have difficulty relating such to the good faith or bad faith of the actions of these Defendants in Pinellas County.

results.[23]  Additionally, the broad prohibition against future enforcement as sought by

Plaintiffs would be inimical to the public interests.[24]

In sum, whether on principles of equity, federalism or comity, or under the

preliminary injunction analysis, the requested relief barring any further enforcement of the

anti-gambling laws goes too far and should be denied.

That said, Plaintiffs raise significant issues pertaining to the issuance of the search

warrant and the scope of the search.  On the available evidence, Defendants' seizure of all the

computers and other devices on the premises of PHI, including even those that were not in use

in connection with the sweepstakes or connected in a manner so as to constitute an alleged

"slot machine," goes well beyond that necessary to investigate the alleged criminal activity at

PHI.  Significantly, the retention of this seized property has effectively shut down lawful

activity on the premises.  Thus, this search and seizure has deliberately and effectively cut off

the wholly lawful activities at PHI in connection with its internet services, the sale of phone

cards, and even the sweepstakes insofar as it can be operated in a fashion not contested by

Defendants.  Such communicative activities inherent in "surfing" the internet and e-mail are

---

[23]This case, as in *Cameron,* involves enforcement against purportedly illegal activity with an entwined speech component.  There, the Court noted that "picketing and parading are subject to regulation even though intertwined with expression."  *Cameron*, 390 U.S. at 617 (quoting *Cox v. Louisiana*, 379 U.S. 559, 563 (1965)).

[24]*See Perez v. Ledesma*, 401 U.S. 82, 84 (1971) ("It is difficult to imagine a more disruptive interference with the operation of the state criminal process short of an injunction against all state proceedings.").  "It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions. . . .  Where the threatened prosecution is by state officers for alleged violations of a state law, the state courts are the final arbiters of its meaning and application, subject only to review by this Court on federal grounds appropriately asserted." *Douglas*, 319 U.S. at 163.

recognized to merit the full protections of the First Amendment. *See Reno*, 521 U.S. at 851. In this light, Defendants' seizure is, at a minimum, oppressive -- property seemingly unrelated to any criminal activity has been taken and retained, to date, no formal charges have been brought against the Plaintiffs or others for any alleged gambling violation, nor have Defendants moved to complete the forensic examination of Plaintiffs' computers and related devices which they purportedly sought to undertake. Given the transcendent value afforded free speech in this country, *see Elrod*, 427 U.S. at 373, Plaintiffs are, at a minimum, entitled to a prompt hearing on the alleged Fourth Amendment violation. However, in my view, that hearing and any intermediate remedy afforded is appropriately addressed, in the first instance, by the state court judge who authorized the search.

As a general principle, it is assumed that a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights. *See Kugler*, 421 U.S. at 124 ("Only if 'extraordinary circumstances' render the state court incapable of fairly and fully adjudicating the federal issues before it, can there be any relaxation of the deference to be accorded to the state criminal process."). While there is no state prosecution pending and *Younger* abstention is not required, state law affords Plaintiffs an immediate remedy before the judge who issued the warrant, if they choose to pursue it.[25] *See* Fla. Stat. § 933.14; *see also, Perez*, 401 U.S. at 84-85 ("The propriety of arrests and the admissibility of evidence in state criminal prosecutions are ordinarily matters to be resolved by state tribunals . . ., subject, of course, to review by certiorari or appeal in this Court.").

---

[25]Plaintiffs' counsel conceded that he has avoided proceedings in the state court ostensibly for fear of creating a waiver argument.

Plaintiffs present no cause to believe that the state court judge would not fairly and fully address their constitutional concerns associated with the scope of the seizure. More to the point, "[t]he need to allow state courts to adjudicate federal constitutional questions in cases pending before those tribunals is the workable result of comity and federalism. . . . Article VI of the United States Constitution 'declares that the Judges in every State shall be bound' by the Federal Constitution, laws and treaties.'. . . Thus the state courts share equivalently with the federal courts the responsibility of protecting constitutional guarantees. . . . Absent facts to the contrary it must be presumed that this obligation will be fulfilled." *Williams v. Rubiera*, 539 F.2d 470, 474 (5th Cir. 1976) (internal citations omitted). Here, Plaintiffs have made no effort to utilize the state procedures available to them or demonstrated that such procedures would be futile. In the circumstances, matters of comity and federalism dictate that they do so before this court involves itself in the matter.

IV.

Accordingly, it is recommended that Plaintiffs' motion for preliminary injunction (Doc. 2) be **denied**.

Respectfully submitted on this
18th day of November 2011.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## <u>NOTICE TO PARTIES</u>

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *see also* Fed. R. Civ. P. 6.

Copies to:
Honorable Elizabeth A. Kovachevich, United States District Judge
Counsel of Record