UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MEGAN CRISANTE
and PMP CAFÉ,

       Plaintiffs,

v.                         Case No. 8:11-CV-2007-T-17TBM

JIM COATS, individually and in his
official capacity as Sheriff of Pinellas
County, Florida, et al.,

       Defendants.

_____/

## ORDER MODIFYING REPORT AND RECOMMENDATION

This cause is before the Court on:

| Dkt. 2 | Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction |
| Dkt. 9 | Response |
| Dkt. 41 | Report and Recommendation |
| Dkt. 43 | Plaintiffs' Objection to Report and Recommendation |

The assigned Magistrate Judge has entered a Report and Recommendation

(R&R) (Dkt. 41) on Plaintiffs' Motion for Temporary Restraining Order and Preliminary

Injunction (Dkt. 2), in which it is recommended that the Motion for Temporary

Restraining Order and Preliminary Injunction be denied.

This Court has independently examined the pleadings and fully concurs with the

Magistrate Judge's ultimate recommendation that Plaintiffs' Motion for a Preliminary

Injunction be denied. The Court modifies the R&R only insofar as it elects not to

abstain from reaching the merits. Instead, the Court denies Plaintiffs' Motion for

Temporary Restraining Order and Preliminary Injunction (Dkt. 2) because Plaintiffs

have failed to demonstrate a substantial likelihood of success on the merits.

## BACKGROUND

The Magistrate Judge's recitation of the facts and procedural posture underlying

the instant case, which are neither clearly erroneous nor the subject of any objection,

are adopted and set forth as follows:

> Plaintiff Megan Crisante (Crisante) is an individual, purportedly residing in
> Florida, with management authority over Palm Harbor Internet (PHI).
> Plaintiff PMP Café, LLC, is a Florida limited liability corporation doing
> business as PHI at 38541 U.S. Hwy. 19 North in Palm Harbor, Florida.
> PHI is engaged in the business of selling prepaid long distance telephone
> cards (phone cards), prepaid cellular phones, cellular accessories,
> internet access, and printing, faxing, and copying services. PHI operated
> a game promotion or "sweepstakes" in connection with its sale of the
> phone cards and provided computers on its premises for customers'
> participation in its sweepstakes and for accessing the internet.[1]

---

[1]The parties do not agree exactly how the sweepstakes works, but it can generally be
described as follows: A PHI customer purchases a phone card from the cashier and is
credited with the amount of phone time purchased as well as a proportionate number of
free sweepstakes "entries." The number of sweepstakes entries received is dependent
upon the amount spent on the phone card. Thus, the more pre-paid minutes
purchased by the customer, the greater the number of sweepstakes entries received.
The customer may also obtain sweepstakes entries with no purchase either by mailing
a request to the sweepstakes sponsor, Phone-Sweeps, or by making a request in
person at PHI. To determine whether the customer is a "winner," the customer may
simply ask the cashier to reveal results by alphanumeric text at a point-of-sale computer
or, alternatively, the customer may use the computer terminals located at PHI to select
quick reveal or to play the casino-style video games to reveal the results of his/her
entries. Use of PHI's computer terminals to reveal sweepstakes results is free. Some
of the video games have a similar look and sound of casino-style games; one offers an
electronic bingo-type game. The customer chooses which game to play, identifies the
number of sweepstakes entries he wishes to play, and then plays the game. If any of

Defendants initiated an investigation of the activities at PHI for suspected illegal gambling activity. On July 14, 2011, Defendants executed a search warrant at PHI seizing Plaintiffs' point-of-sale computer, scores of personal computers at work stations and in boxes in storage, related computer equipment, cash, placards, a safe, a digital video recorder, and Tel-Connect phone cards among other items of property. Defendants Bahret and Giovannoni were affiants on the affidavit in support of the search warrant and participated in the search. By the deputies' sworn averments, many of which are disputed by Plaintiffs, Plaintiffs' business is:

> being operated under the disguise of a retail outlet that offers a sole product for sale and offers a 'sweepstakes' under 849.094 FSS (Game Promotion in connection with sale of consumer products or services) to promote gross sales. . . . [S]aid business is involved in selling a single phone card that offers local and long distance calling in conjunction with chances to win cash prizes. Unlike a traditional Promotional Sweep-stakes such as the widely known McDonald's Monopoly where a single pull-tab is provided on the purchased box of a Big Mac, said Palm Harbor Internet Services' 'sweepstakes' is offered electronically on a common Personal Computer (PC) and has the appearance of a Las Vegas style slot machine. . . . While the business model propagates promoting a viable product via sweepstakes, the business model runs afoul of 849.15 by adapting innocent devices in such a way that they are converted into an illegal slot machine and overshadow the sales of the product.

(Doc. 21-1 at 6–7). By the deputies' further averments, the sale of phone cards was not at the forefront of the business but secondary to the gaming activity played in connection with the sweepstakes offered in

---

the entries played are winners, such is depicted in a manner similar to the winning image in the casino game, for example, a certain number of similar images in a row. Winnings are represented as points and are displayed and accumulated on the screen in a "win points" column which can be redeemed for cash prizes. The customer may continue to play the video games as long as he/she has sweepstakes entries to play. The games may be played only in connection with the sweepstakes and there is no opportunity for a customer to pay to play. The pre-paid telephone minutes purchased are never depleted by playing the video games and regardless of the sweepstakes results, the customer always walks away with the same number of minutes purchased.

connection with the phone cards. Thus, "the business of the consumer product offered[,] it is over whelmed by the advertisement within the business to play sweepstakes and win cash. The business model wants the consumer to sit, play, enjoy and believe that they can win cash on the devices." To that end, the interior of the business has a "Las Vegas casino mood" about it. And, to attract and entice customers to sit and repeatedly play, the Defendants' "'sweepstakes' is offered electronically . . . and has the appearance of a Las Vegas style slot machine." The games have a "traditional appearance of a slot machine with virtual reels that contained various icons, payout lines, buttons and display windows." According to their gaming expert, the "readers are designed to show sights and sounds that replicate those found on acknowledged Las Vegas type slot machines to heighten the suspense and excitement of play." (Doc. 21-1 at 7–8, 16).

The affiants set forth in some detail their investigation and understanding of how the system worked to operate as a slot machine in violation of Florida law. *See id.* at 8–11. They also referenced the opinion of Desmond Ladner, a purported expert on legal and illegal gaming matters, who also conducted an undercover investigation at the premises and offered his opinion that PHI operated as a gambling establishment and that its computers as networked constituted slot machines as defined under Florida law. *See id.* at 16–18. In sum, the affiants represented that when all the components of the system are considered collectively they are slot machines within the context of Fla. Stat. § 849.16 and are being used in violation of Fla. Stat. § 849.15.

The search warrant issued out of the Circuit Court in Pinellas County, Florida, on a finding that "the facts as alleged do exist and that the law is being violated as alleged and/or property which constitutes evidence relevant to proving that said crime has been committed is located [on the PHI premises] . . . ." (Doc. 21-1 at 1). The warrant authorized the seizure of:

> Slot machines to include all devices consisting of video monitor/tower combinations, keyboards, mouse and connecting cables, all network devices, all server devices, Point of Sale computer, all electronic storage devices connected internally or externally to any device, Point of Sale computer, Network device or Server, any documents showing evidence of maintaining the gambling house to include but not limited to utility records, bank records, Department of Revenue records, Winners Logs, Tel-

Connect cards, . . . and any other gambling paraphernalia in order that the evidence may be procured to be used in the prosecution of such person or persons found to be involved in the illegal activity as alleged.

(Doc. 21-1 at 2). Additionally the warrant permitted for these items to be forensically examined. *Id.* at 3.

Suffice it to say that the Defendants' seizure of all the computers and related devices from PHI[2] has effectively shut down the sweepstakes activity on the premises. It has also shut down PHI's internet services as well. As of yet, no arrests have been made and no criminal charges have been brought. Nor have forfeiture actions been commenced against the seized property.

B.

In response to seizure of their property, Plaintiffs filed their Verified Complaint asserting claims for violation of their Fourth, First, and Fourteenth Amendment rights (Counts I–III respectively) and seeking declaratory and injunctive relief (Counts I–IV). They further allege a claim for replevin by which they seek damages and a return of their property (Count V). *See* (Doc. 1). By Crisante's verified allegations, Plaintiffs operate their sweepstakes as a lawful game promotion in full compliance with Fla. Stat. § 849.094. As a consequence of Defendants' enforcement actions, their First, Fourth, and Fourteenth Amendment rights have been violated and an injunction is necessary to avoid further infringement of their constitutional rights, in particular, their First Amendment rights, should they seek to continue their sweepstakes. Plaintiffs maintain that the video games used in connection with their phone card sweepstakes, as well as the internet communications services separately provided to customers, are communications protected by the First Amendment.[3] The taking of all the computers and related devices has completely curtailed the speech rights of their customers who seek to buy and use these internet services. (Doc. 1 at 8–12). In some detail, they assert that there is a clear pattern of harassment against phone-sweeps retailers such as

---

[2] A copy of the search warrant return is found as an exhibit to the Complaint. *See* (Doc. 1 at 58).

[3] Other than a pornography filter, PHI did not limit, monitor, regulate, or restrict the use of its computers or the internet sites accessed by its customers in any way.

PHI and that given that history, Defendants are acting knowingly and in bad faith to eliminate their ability to engage in business and thus protected speech-related activities. *Id.* at 14–20.[4] Additionally, Plaintiffs assert numerous instances wherein Defendants Giovannoni and Bahret made false or misleading factual assertions to the judge in the affidavit in support of the search warrant and, along with their expert, Ladner, asserted absurd legal conclusions in support of their claim that PHI was operating a gambling establishment using slot machines. They also maintain that the seizure by Defendants exceeded the permissible scope of the search warrant. *Id.* at 24–34.

Plaintiffs maintain that the enforcement activities directed toward their use of depictions of casino-style gaming to reveal the results of their sweepstakes amounts to prohibited content-based restrictions on their rights to speech. By their assertions, while the Defendants have deemed the method of displaying sweepstakes results to be illegal, there is no difference between the "traditional Promotional Sweepstakes" referenced by affiants and Plaintiffs' sweepstakes other than the manner and content of the communication of the results.[5] (Doc. 1 at 34–40). As a

---

[4]In particular, Plaintiffs reference enforcement activities in Marion and Pinellas County. Thus, they contend there is a pattern of harassment as evidenced by some nineteen criminal prosecutions against phone-sweeps retailers in the past two years. By Plaintiffs' accounting, none of these prosecutions resulted in a conviction. Rather, the cases were either dismissed or the sweepstakes' operators prevailed at jury trial. In addition to criminal prosecutions, there have been multiple civil forfeiture actions, including five civil forfeiture actions by the Sheriffs in Marion and Pinellas County. Of these, all were voluntarily dismissed and in four the property returned. With this track record, Defendants may not claim any good faith but mistaken belief that their actions in shutting this business down were in good faith and lawful. *Id.*

[5]By their motion, Plaintiffs contend that Florida law does not proscribe their sweepstakes. Thus, Plaintiffs argue gambling has three elements: (1) consideration paid; (2) for a chance; (3) to win a prize. Their sweepstakes is not gambling because the participants never pay consideration for the chance to win. Instead, the consideration paid by the customer is for the phone card, and the chances to win are provided at no additional cost as part of the game promotion. The customer never risks the loss of any money paid. Since the element of consideration is missing, their sweepstakes, like the so-called "traditional" sweepstakes, is a legal game promotion in contemplation of Fla. Stat. § 849.094. As for Defendants' claim that the computer-based system Plaintiffs use to reveal sweepstakes winners is an illegal slot machine as

consequence of these enforcement activities, their property has been wrongfully taken and withheld, *see id.* at 53–54; their Fourth Amendment rights to be free from unreasonable searches have been violated, *see id.* at 40–42; their rights to free speech have likewise been denied and are being denied, *see id.* at 42–47; and their Fourteenth Amendment rights to equal protection have been denied, *see id.* at 47–51.

(Dkt. 41, at 1–7). Though Plaintiffs' complaint contains all counts set forth above, Plaintiffs' motion for a preliminary injunction is primarily based on the alleged First Amendment violation effected by the seizure of their hardware and equipment. *See, e.g.,* Dkt. 2, at 20 (explaining that Plaintiffs' seek to enjoin Defendants "from taking any further enforcement action against Plaintiffs for their lawful, speech-related activities"). On January 17, 2012, Plaintiffs filed a separate action in state court in Pinellas County, Florida pursuant to section 933.14 of the Florida Statutes, Case No. 12-838-CI-001-77, seeking the return of their property. (Dkt. 44, at 1).

## DISCUSSION

### 1. Abstention

Before proceeding to the merits of Plaintiffs' motion, it is necessary to determine whether "matters of comity and federalism" require that this Court stay its hand. (Dkt. 41, at 22). The Supreme Court's "decisions have confined the circumstances appropriate for abstention to three general categories." *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 814 (1976); *see also Quackenbush v. Allstate Ins.*

---

defined in Fla. Stat. § 849.16, Plaintiffs urge that Defendants simply cannot bring their devices within the statutory definition. *See* (Doc. 2 at 14–15).

*Co.*, 517 U.S. 706, 717 (1996) (listing various categories of abstention).[6] Abstention is permitted: (1) where "there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," *Colorado River*, 424 U.S. at 814; *see La. Power & Light Co. v. City of Thibodaux*, 306 U.S. 25 (1959) (permitting abstention where the scope of municipality's eminent domain power under state law was disputed); *Burford v. Sun Oil Co.*, 319 U.S. 315, 333–34 (1943) (inaugurating *Burford* abstention in case involving review of state commission's permit to drill oil); (2) "where . . . federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings," *Colorado River*, 424 U.S. at 816; *see Steffel v. Thompson*, 415 U.S. 452, 454 (1974); *Younger v. Harris*, 401 U.S. 37, 41 (announcing *Younger* abstention, which "forbid[s] federal courts to stay or enjoin pending state court proceedings except under special circumstances"); and (3) where the plaintiff brings both a state and a federal claim, and the state-law claim is "fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question," *City of Houston v. Hill*, 482 U.S. 451, 468 (1987);

---

[6]*Colorado River* itself can be said to have inaugurated a fourth brand of abstention—grounded in "considerations of '(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation'"—and by which abstention is required in certain cases where a federal suit is duplicative of a pending state proceeding and in which there a federal statutory policy disfavoring piecemeal resolution of the dispute in separate federal or state proceedings. 424 U.S. at 817–19 (quoting *Kerotest Mfg. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952)); *see* Michael P. Allen et al., *Federal Courts: Context, Cases, and Problems* 690–91 (2009) (explaining the "exceptional circumstances" in which a federal court can enjoin duplicative state proceedings). *Colorado River* abstention does not apply here.

*see R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941) (introducing this type of abstention, commonly known as *Pullman* abstention).

That said, and though abstention doctrine might seem expansive at first blush, "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule," *Colorado River*, 424 U.S. at 813, and "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them" is not lost on this Court, *id.* at 817. As the R&R does not specify precisely which type of abstention formed the basis for the Magistrate Judge's decision to abstain, this Court considers each in turn.

## A. Burford *Abstention*

Both parties impliedly concede that *Burford* abstention is not warranted here. That makes good sense, too, given that "[t]he purpose of *Burford* abstention is to 'protect[ ] complex state administrative processes from undue federal interference.'" *Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260, 1265 (11th Cir. 2000) (quoting *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans* (*NOPSI*), 491 U.S. 350, 362 (1989)). The instant case does not implicate any Florida state administrative process; *Burford* abstention is inapposite.

## B. Younger *Abstention*

To determine whether *Younger* abstention is appropriate, "'[t]he question . . . is threefold: first, do [the proceedings] constitute an ongoing state judicial proceeding; second, do the proceedings implicate important state interests; and third, is there an

adequate opportunity in the state proceedings to raise constitutional challenges.'" *31 Foster Children v. Bush*, 329 F.3d 1255, 1274 (11th Cir. 2003) (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)).

 Starting with the first requirement, there must be some ongoing state proceeding in order for *Younger* abstention to be implicated at all. *See id.* at 1274–75 (noting that the first requirement of *Younger* is that the proceedings at issue "constitute an ongoing state judicial proceeding"); *For Your Eyes Alone, Inc. v. City of Columbus*, 281 F.3d 1209, 1217 (11th Cir. 2002) ("[W]e note that in *Steffel v. Thompson*, the Supreme Court held that *Younger* abstention is inappropriate if there is no pending state criminal prosecution of the plaintiff."). In this case, though Plaintiffs have been the subject of a search warrant, they have not been charged with any crime, and therefore no state prosecution is pending that would be interrupted by the extant federal action. *Cf. Kirby v. Illinois*, 406 U.S. 682, 689 (1972) (noting that judicial proceedings for purposes of Sixth Amendment right to counsel may commence in various ways, including via "formal charge, preliminary hearing, indictment, information, or arraignment"); *Traylor v. State*, 596 So. 2d 957, 968 (Fla. 1992) (holding that "prosecution begins under the Counsel Clause when an accused is charged with a criminal act"). In fact, the *only* state action pending here is the one that Plaintiffs themselves filed in Pinellas County seeking the return of their property. (Dkt. 44, at 1).

 This Court must therefore determine whether Plaintiffs' newly filed state action is indeed an "ongoing state proceeding" for purposes of *Younger*. *Younger* itself involved

a plaintiff who sued in federal court to enjoin his pending state criminal prosecution. *Younger v. Harris*, 401 U.S. 37, 39 (1971). And although *Younger* can also apply to "noncriminal judicial proceedings," it simply does not apply in cases where the federal suit does not seek relief that would somehow interfere with the state judicial proceeding. *Middlesex*, 457 U.S. at 432 (holding that *Younger* required abstention where federal suit sought to enjoin state attorney disciplinary proceedings); *see News-Journal Corp. v. Foxman*, 939 F.2d 1499, 1511 (11th Cir. 1991) (affirming decision to abstain under *Younger* where newspaper challenged state court's pre-trial order in federal court because an injunction would have restricted the ability of the state court to empanel an impartial jury).

Therefore, *Younger* requires not only that a state proceeding be ongoing, but also that "the federal proceeding will *interfere* with an ongoing state court proceeding." *31 Foster Children*, 329 F.3d at 1276 (emphasis supplied) ("[W]e join our sister circuits in explicitly stating that an essential part of the first *Middlesex* factor in *Younger* abstention analysis is whether the federal proceeding will interfere with an ongoing state court proceeding."). "If there is no interference, then abstention is not required." *Id.* Though federal interference with state court proceedings is barred, there is no rule against duplicative or concurrent proceedings in both federal and state courts—put another way, "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the [f]ederal court having jurisdiction." *McClellan v. Carland*, 217 U.S. 268, 282 (1910); *see also NOPSI*, 491 U.S. at 373 ("[T]here is no

11

doctrine that the availability or even the pendency of state judicial proceedings excludes the federal courts.").

In *Colorado River*, for example, the Supreme Court considered a scenario in which the Untied States brought suit in federal court seeking a declaration of its right to ownership of certain water rights in Colorado; one of the defendants then filed suit in state court seeking a similar determination of the ownership of the disputed property rights. 424 U.S. at 805–06. Despite the fact that the federal and state cases both involved a determination of ownership rights of the same property (the water rights), the Supreme Court rejected the argument that *Younger* barred the federal court from hearing the cause:

> [A]bstention is appropriate where, absent bad faith, harassment, or a patently invalid state statute, federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings, state nuisance proceedings antecedent to a criminal prosecution, which are directed at obtaining the closure of places exhibiting obscene films, or collection of state taxes. Like the previous two categories, this category also does not include this case. We deal here neither with a criminal proceeding, nor such a nuisance proceeding, nor a tax collection. We also do not deal with an attempt to restrain such actions or to seek a declaratory judgment as to the validity of a state criminal law under which criminal proceedings are pending in a state court.

*Colorado River*, 424 U.S. at 816–17 (footnotes omitted).

Similarly here, Plaintiffs have brought a concurrent suit in state court seeking the return of their property. (Dkt. 44, at 1). And in the instant federal lawsuit, they do not pray to enjoin or restrain their own concurrent state proceeding in any way—indeed, it would be absurd for Plaintiffs to seek, through a federal lawsuit, to enjoin or restrain

*their own* state court proceeding. That is perhaps why, in most every case in which

*Younger* abstention is required, the federal plaintiff is the defendant or respondent in

the state proceeding, and the federal suit seeks a declaration or injunction restricting

the state court's ability to hear the matter. Plaintiffs simply pray for the return of their

property in both a federal and a state forum. And though cases in which the federal

plaintiff is *also* the plaintiff or moving party in the state court action regarding the same

subject matter (here, the seized property) may be duplicative proceedings, they are not

the type of federal proceedings that threaten the federal-state balance in such a way as

to implicate "the considerations of comity and federalism which underlie *Younger.*"

*Huffman v. Pursue, Ltd.*, 420 U.S. 592, 610 (1975). Frankly speaking, then, such state

proceedings, like the state court action in this case, are beyond *Younger*'s grasp.

*Younger* abstention does not apply.

### C. Pullman *Abstention*

Finally, the Court turns to whether *Pullman* abstention requires it to abstain from

reaching the merits of the instant motion:

> Under the *Pullman* abstention doctrine, a federal court will defer to state
> court resolution of underlying issues of state law. Two elements must be
> met for *Pullman* abstention to apply: (1) the case must present an
> unsettled question of state law, and (2) the question of state law must be
> dispositive of the case or would materially alter the constitutional question
> presented. The purpose of *Pullman* abstention is to avoid unnecessary
> friction in federal-state functions, interference with important state
> functions, tentative decisions on questions of state law, and premature
> constitutional adjudication. Because abstention is discretionary, it is only
> appropriate when the question of state law can be fairly interpreted to
> avoid adjudication of the constitutional question.

*Siegel v. LePore*, 234 F.3d 1163, 1174 (11th Cir. 2000) (citations and quotations

omitted).

The instant case presents a nettlesome issue of state law—namely, whether

Plaintiffs' sweepstakes operation runs afoul of Florida's gambling laws. The Magistrate

Judge described the salient Florida statutes:

> Section 849.08, Fla. Stat., which is entitled "Gambling," states: "[w]hoever plays or engages in any game at cards, keno, roulette, faro or other game of chance, at any place, by any device whatever, for money or other thing of value, shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083."

> Under Florida law, sweepstakes or "'game promotion' means . . . a contest, game of chance, or gift enterprise, conducted within or throughout the state and other states in connection with the sale of consumer products or services, and in which the elements of chance and prize are present." Fla. Stat. § 849.094(1)(a).

> "Any machine or device is a slot machine or device within the provisions of this chapter if it is one that is adapted for use in such a way that, as a result of the insertion of any piece of money, coin, or other object, such machine or device is caused to operate or may be operated and if the user, by reason of any element of chance or of any other outcome of such operation unpredictably by him or her, may: (a) [r]eceive or become entitled to receive any piece of money, credit, allowance, or thing of value, or any check, slug, token, or memorandum, whether of value or otherwise, which may be exchanged for any money, credit, allowance, or thing of value . . . ; or (b) [s]ecure additional chances or rights to use such machine, apparatus, or device, even though it may, in addition to any element of chance or unpredictable outcome of such operation, also sell, deliver, or present some merchandise, . . . or other thing of value." Fla. Stat. § 849.16(1).

> Florida law prohibits the use of slot machines or devices, "pursuant to which the user thereof, as a result of any element of chance or other outcome unpredictable to him or her, may become entitled to receive any money, credit, allowance, or thing of value or additional chance or right to use such machine or device, or to receive any check, slug, token or

memorandum entitling the holder to receive any money, credit, allowance or thing of value." Fla. Stat. § 849.15(1)(b).

(Dkt. 41, at 8–10). Plaintiffs point out that "[t]he state of Florida has lost or dismissed every case it has filed relating to the Phone-Sweeps sweepstakes." (Dkt. 2, at 14). And though three different Florida Attorneys General have issued advisory legal opinions indicating that such sweepstakes are offensive to Florida's gambling laws, Op. Att'y Gen. Fla. 2011-14 (Fla. A.G. July 19, 2011); Op. Att'y Gen. Fla 2007-48 (Fla. A.G. Nov. 7, 2007); Op. Att'y Gen. Fla. 98-07 (Fla. A.G. Feb. 5, 1998), "[t]he test of uncertainty [for purposes of *Pullman* abstention] is typically said to be that the state law must be *fairly subject* to an avoiding construction." *Duke v. James*, 713 F.2d 1506, 1510 (11th Cir. 1983) (emphasis in original). Here, the Florida gambling laws are certainly susceptible of an interpretation that would avoid the constitutional question at hand—after all, if a court were to hold that Plaintiffs' sweepstakes operation does not fall within the ambit of Florida's gambling laws, it would obviate the entire constitutional inquiry that lies at the heart of this case. The issue here accordingly slakes both requirements of *Pullman* abstention because it (1) presents an unsettled question of state law (2) susceptible of an interpretation that would be dispositive of the case. *Siegel*, 234 F.3d at 1174.

Even where abstention is available, however, certification to the state supreme court provides "the preferable way to obtain state court resolution of [uncertain] state law issues" in a streamlined manner, *Pittman v. Cole*, 267 F.3d 1269, 1288 (11th Cir. 2001), free from the "delays, expense, and procedural complexity that generally attend

abstention decisions." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997). But only "the Supreme Court of the United States or a United States Court of Appeals" may certify a question to the Florida Supreme Court, and the mechanism is therefore unavailable at this juncture. Fla. Const. Art. V, § 3(b)(6); *see Bridges v. Seminole Cnty.*, No. CV-1010-Orl-28DAB, 2008 WL 638330, at *4 (M.D. Fla. Mar. 5, 2008) ("A [federal] district court lacks the authority to certify questions to the Florida Supreme Court.") (alteration in original)). The availability of certification is thus no bar to this Court's abstaining from reaching the merits of Plaintiffs' motion. *See Pittman*, 267 F.3d at 1290–91 (reversing district court's decision to abstain in light of the availability of certification to the state supreme court).

Despite all the foregoing, it does not necessarily follow that abstention is proper here. Though this Court will not shrink from its role as guarantor of the essential values of comity and federalism in our system of government, it also bears in mind that "the *Pullman* doctrine is narrow and is tightly circumscribed." *Duke*, 713 F.2d at 1510. "A federal court must grapple with difficult constitutional questions that confront it squarely. The abstention doctrine is an exception to this rule, to be exercised only in *special* or '*exceptional*' circumstances." *Duke*, 713 F.2d at 1510 (emphasis in original). Perhaps most important with regard to the extant case, "[a]bstention is to be invoked particularly sparingly in actions involving alleged deprivations of First Amendment rights." *Cate v. Oldham*, 707 F.3d 1176, 1184 (11th Cir. 1983); *see Pittman*, 267 F.3d at 1290 (interpreting *Cate* as having found "that abstention was inappropriate in light of the high

16

stakes involved in a First Amendment case"). In sum, and taking full "account [of] the nature of the controversy and the importance of the right allegedly impaired," *Siegel*, 234 F.3d at 1174, this Court declines to exercise its discretion to abstain from reaching the merits of the case at bar. *See Baggett v. Bullitt*, 377 U.S. 360, 376 (1964) ("The abstention doctrine is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers. Ascertainment of whether there exist the special circumstances prerequisite to its application must be made on a case by case basis.") (internal quotation marks omitted). This decision incidentally moots Plaintiffs' objection to the Magistrate Judge's R&R, (Dkt. 43, at 2) (objecting to fact that R&R did not permit plaintiffs to "reserve their right to litigate their federal constitutional claims in federal court" upon decision to abstain), and the Court therefore proceeds directly to the merits of Plaintiffs' motion for a preliminary injunction.

## 2. Preliminary Injunction Analysis

"The grant or denial of a preliminary injunction is a decision within the discretion of the district court." *Carillon Imps., Ltd. v. Frank Pesce Int'l Grp. Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary and drastic remedy not

to be granted unless the movant clearly establishes the burden of persuasion as to the

four requisites." *Forsyth Cnty. v. U.S. Army Corps. of Eng'rs*, 633 F.3d 1032, 1039

(11th Cir. 2011).

Plaintiffs move for a preliminary injunction enjoining Defendants "from taking any

further enforcement action against Plaintiffs for their lawful, speech-related activites."

(Dkt. 2, at 20). Further, and as the Magistrate Judge noted:

> Plaintiffs claim ongoing infringement of their First Amendment rights as a
> consequence of Defendants' improper enforcement and taking of all of
> their computers and related devices and the threat of continued
> enforcement action should they reestablish their sweepstakes. They urge
> [that] the enforcement is directed against the content of their video games
> used in conjunction with the sweepstakes. Thus, their rights to free
> expression are affected in several ways. First, the internet access
> previously provided to employees and customers– but now denied– is a
> form of pure speech zealously protected by the First Amendment.
> Further, video games are a recognized form of expression, even if such
> videos depict casino-type games, and thus deserve First Amendment
> protection. And, even if their sweepstakes is viewed as a form of
> advertising or marketing and thus commercial speech offering customers
> the possibility of a prize, it is entitled to significant First Amendment
> protection. Plaintiffs purportedly do not challenge Florida's gambling laws
> as unconstitutional but instead contend that Defendants seek to enforce
> laws that are "not on the books" to suppress speech fully protected by the
> First Amendment. In short, Plaintiffs contend that they are substantially
> likely to prevail on their constitutional claim as their depiction of gambling-
> type activity to reveal sweepstakes winners does not violate Florida law
> and the enforcement action is simply a content-based restriction on their
> free speech rights.

(Dkt. 41, at 10–11) (footnotes omitted).

Fortunately, this court has recently decided a similar case, *Allied Veterans of the*

*World, Inc.: Affiliate 67 v. Seminole County*, that illuminates many of the issues at play

here. 783 F. Supp. 2d 1197 (M.D. Fla. 2011) (Antoon, J.) (hereinafter "*Allied Veterans*

*I*"), *aff'd*, No. 11-12185, 2012 WL 933342 (11th Cir. Mar. 21, 2012) (per curiam)

(hereinafter "*Allied Veterans III*"). The plaintiffs in *Allied Veterans* operated Phone-

Sweeps businesses nearly identical to those implicated in the case *sub judice*, and

sued to challenge a Seminole County ordinance that prohibited "simulated gambling

devices"[7] as repugnant to the First Amendment guarantee to freedom of speech. *Allied*

*Veterans I*, 783 F. Supp. 2d at 1199–1201. More specifically, and of particular import to

the instant case, the plaintiffs "assert[ed] that the Ordinance violate[d] the First

Amendment as applied to them because it [was] a content-based restriction on

speech." *Id.* at 1202. This court rejected that argument, noting:

> [T]he Ordinance in no way prohibits access to the internet; it only
> regulates the simulated gambling devices. Furthermore, although the
> games played at Operator-Plaintiffs' establishments may constitute
> protected speech, the Ordinance only bans the games if all elements of
> the definition of "simulated gambling device" are present. As noted
> above, a device must entitle the player to the possibility of a payoff in
> order to constitute a "simulated gambling device." None of the video
> games at issue is banned on its own—only the playing of such a game *in
> conjunction* with the possibility of a payoff is banned. Therefore,
> Operator-Plaintiffs are free to provide the video games to their patrons
> and their patrons are free to play them—and thus make and receive
> whatever protected message is communicated by the video game—so
> long as the games are not associated with a payoff.
>
> Operator-Plaintiffs also argue that the Ordinance bans speech that is
> "associated with gambling." This argument takes the Ordinance out of
> context. The "associated with gambling" language is part of the definition
> of "game." A "game" as defined by the Ordinance includes games that

---

[7]The ordinance defined "simulated gambling devices" as "any device that, upon
connection with an object, is available to play or operate a computer simulation of any
game, and which may deliver or entitle the person or persons playing or operating the
device to a payoff." *Allied Veterans I*, 783 F. Supp. 2d at 1201.

are, or could be, associated with gambling. The ordinance in no way bars all speech associated with gambling; it only bans *games* associated with gambling *if* those games also provide the possibility of a payoff.

*Id.* (emphasis in original) (footnote omitted).

Further, in a subsequent order denying the *Allied Veterans* plaintiffs' motions to stay trial court proceedings pending appeal and for an injunction pending appeal, this court rejected the plaintiffs' assertion that *Brown v. Entertainment Merchants Association*, --- U.S. ----, 131 S. Ct. 2729 (2011), and *Citizens United v. Federal Election Commission*, --- U.S. ----, 130 S. Ct. 876 (2010) alter the constitutional analysis, again noting that the Ordinance did not outlaw the *speech* underlying the sweepstakes games itself, but rather proscribed the *conduct* of providing a payoff when facilitating the use of a simulated game device. *Allied Veterans of the World, Inc.: Affiliate 67 v. Seminole Cnty.*, No. 6:11-CV-155-Orl-28DAB, 2011 WL 3958437, at **1–3 (M.D. Fla. Sept. 8, 2011) (hereinafter *Allied Veterans II*").

The Eleventh Circuit affirmed the denial of plaintiff's motion for a preliminary injunction. *Allied Veterans III*, 2012 WL 933342, at *2. The court noted: "We agree with the district court that a threshold issue is whether the ordinance regulates speech or conduct, but we need not resolve this issue to decide this appeal. Whether the district court's determination of this point is right or wrong, the record before us indicates no abuse of discretion in the denial of preliminary injunctive relief." *Id.* at *1.

This Court concurs with Judge Antoon's reasoning in both *Allied Veterans I* and *II*; therefore, and applying the teachings of those cases to the facts at hand, it quickly

follows that any potential enforcement of Florida's gambling laws pursued by Defendants here restricts conduct, not speech. The state of Florida is merely investigating a potential violation of its gambling laws. In that regard, the instant case is simply beyond the pale of the First Amendment's protection.

Plaintiffs bear the heavy burden of demonstrating their substantial likelihood of success on the merits, and that they have failed to do. *See Siegel*, 234 F.3d at 1176 ("In this Circuit, [a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." (internal quotation marks omitted)). Having found that Plaintiffs fail to demonstrate a likelihood of success on the merits, this Court need not go further. *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011) ("If [the plaintiff] is unable to show a substantial likelihood of success on the merits, we need not consider the other requirements."). Accordingly, it is

**ORDERED** that the Report and Recommendation (Dkt. 41) be **modified** as enumerated herein, that Plaintiffs' objections be **overruled** as moot, and that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 2) be **DENIED**.

**DONE AND ORDERED** in Chambers, in Tampa, Florida this ____ day of April, 2012.

#8: 11 CV 2007-T-17-TBm

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies to: All parties and counsel of record.